# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-20650

United States Court of Appeals
Fifth Circuit

**FILED**

December 20, 2018

Lyle W. Cayce
Clerk

NOEL T. DEAN,

>    Plaintiff - Appellee

v.

DARSHAN R. PHATAK,

>    Defendant - Appellant

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

Before HIGGINBOTHAM, JONES, and GRAVES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

A state medical examiner appeals the denial of his motion for summary judgment based on qualified immunity on claims arising from the failed prosecution of a husband for the death of his wife. We vacate the district court's denial and remand for reconsideration of the motion confined to the summary judgment evidence, and further proceedings consistent with this opinion.

## I.

In the early hours of July 30, 2010, Shannon Dean died of a gunshot to the head, fired while she was lying on the floor of her master bathroom. Her husband, Noel Dean ("Dean"), was present during the shooting, and described

to the police that, following an argument, his wife shot herself using his handgun, a 40-caliber Smith & Wesson Model 410 pistol. Dean also described Shannon's previous suicide attempts, including one that left a scar on her arm. During the course of police interviews, pressed by officers as to how Shannon shot herself, Dean demonstrated that Shannon held the gun to the right side of her head with the handle oriented toward her feet.

The following day, July 31, 2007, Harris County Assistant Medical Examiner, Dr. Darshan Phatak, conducted Shannon's autopsy. Phatak had passed his board-certification exam in forensic pathology and joined the Medical Examiner's office in the previous year. As was customary, the investigating officer, Millard Waters of the Houston Police Department, attended the autopsy. There, Waters shared his theory with Phatak that Dean was the shooter, and expressed his hope that the autopsy would confirm his suspicions. He stressed that the position of the gun would be important: if the gun was fired with the handle upward it was likely a murder; if it faced downward, as Dean had recounted, it was likely a suicide. During the autopsy, Waters pointed out what appeared to be an imprint of the pistol's front sight in the five o'clock position with respect to the entrance wound, and another mark at about the eleven o'clock position apparently corresponding to the weapon's ejector rod. Waters observed that these impressions were inconsistent with Dean's description of the shooting. Waters also brought to Phatak's attention a dark line on Shannon's arm. Phatak examined it, and concluded it was not the result of a suicide attempt. Phatak later conceded that he could not rule out the possibility that the mark resulted from Shannon's self-cutting with a razor blade. The draft report indicated the cause and manner of death were pending.

No. 16-20650

A week later, on August 6, 2007, Phatak met to discuss the case with Waters and other officials. Such meetings were a normal practice for medical examiners. In this meeting, Phatak examined the gun used in the shooting. He also examined photos of the wound. Holding the gun, Phatak lay down on the floor and demonstrated the manner in which Dean described Shannon shooting herself. He explained that he had observed abrasions around the entrance wound: a crescentic abrasion in the 11 o'clock position, and linear abrasions at the 4 and 5 o'clock positions. He observed that the crescentic abrasions corresponded to the gun's ejector rod, and the linear abrasions to the gun's front sight—meaning that the gun was fired in a "handle up" position, the opposite from the gun position in Dean's description. Phatak assured Waters that his final report would not conclude the manner of death was undetermined—it would designate the manner of death as either suicide or homicide.

Following the meeting, Phatak viewed part of Dean's videotaped interview, the less than five minutes during which Dean described how Shannon had shot herself. He found that during this part of the video Dean was never instructed to place the gun against his head in exactly the way it was positioned during the shooting. Phatak also considered toxicology analysis conducted as part of the autopsy, which indicated that alcohol concentrations had been 0.15 g/dL in Shannon's blood, and 0.19 g/dL in her vitreous humor (fluid from within the eyeball). Considering these alcohol levels and the presence of vomit in the bathroom, Phatak concluded that Shannon had been unconscious at the time of the shooting. He later testified that a person with a 0.15 g/dL blood alcohol concentration could engage in conscious physical movements like running. Phatak also reviewed information regarding Shannon's past suicide attempts and suicidal ideation. He reviewed a Word

3

document recovered from Shannon's PDA in which she described cutting herself and thoughts about taking her own life. Phatak also read a letter from a pastor or former counselor expressing the belief that Shannon did not commit suicide. During his analysis, Phatak did not directly compare the weapon to the wound. Phatak's expert, his colleagues, and Phatak himself stated that such weapons-to-wounds comparisons are neither required nor routine practice among medical examiners. Dean's own witness at his murder trial, former Harris County Medical Examiner, Dr. Joye Carter, appears not to have conducted such a comparison in connection with Dean's defense.

On August 27, 2007, Phatak submitted his determination that Shannon's cause of death was homicide. Central to this determination was Phatak's finding that the gun was fired with its handle facing up, contradicting Dean's indication that the gun's handle had pointed downward. The report was finalized when Phatak's senior colleagues, Dr. Arturo Sanchez and Dr. Dwayne Wolf reviewed and approved its conclusions.

Waters used the report's homicide determination to support a warrant for Dean's arrest. Dean was charged and tried twice for Shannon's murder. The first trial in October 2009 ended with a deadlocked jury. A second trial was held in January 2011. At this second trial Phatak testified regarding his determination that Shannon's wound was consistent with the gun being fired with the front sight oriented toward her feet, the ejector rod and handle oriented toward her head. Dr. Wolf was also asked to testify during the second trial. In his deposition and affidavit, Dr. Wolf describes that in preparation for his testimony he created a photographic overlay, comparing the muzzle of a Smith & Wesson Model 410 pistol with Shannon's head wound in order to demonstrate the gun's orientation. Once completed, the photographic overlay indicated that the weapon had been held with the handle down, as Dean

4

maintained. As a result, Wolf and his colleagues amended the autopsy report to list Shannon's manner of death as "undetermined." The state dismissed the charges against Dean in the middle of the second trial.

Dean sued Phatak under 42 U.S.C. § 1983, alleging that Phatak violated his rights under the Fourth, Sixth, and Fourteenth amendments by intentionally fabricating the autopsy report. Asserting qualified immunity, Phatak moved for summary judgment. Phatak now appeals its denial.

## II.

The denial of summary judgment on the basis of qualified immunity is a collateral order capable of immediate review.[1] On appeal, we ask "the purely legal question whether the defendants are entitled to qualified immunity on the facts that the district court found sufficiently supported in the summary judgment record."[2] Where the district court finds that the summary judgment record presents a genuine dispute of material fact, we do not challenge its determination of "whether there is enough evidence in the record for a jury to conclude that certain facts are true."[3]

Here, the district court concluded that "a genuine issue of material fact exists as to whether Phatak falsified evidence," and that "Dean has put forth sufficient evidence to show intentional fabrication of evidence." On appeal, Phatak argues that these are conclusory statements, not findings, because the district court relied entirely on Dean's allegations, not summary judgment evidence. The district court's order states that it relied upon the parties' briefs with accompanying exhibits, as well as other evidence such as the police interrogation of Dean. However, the district court's analysis cites allegations in the pleadings, without reference to record evidence. In the absence of an

---

[1] *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

[2] *Id.*

[3] *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004).

identification of summary judgment evidence relied upon, we cannot affirm the denial of qualified immunity, and, in deference to the district court, we decline to search the record further. That effort must be undertaken by the district court in the first instance—mindful that unless a rational juror could find that Phatak intentionally misstated his finding, he is entitled to qualified immunity. Negligence, even gross negligence, is not sufficient.

We vacate and remand for the district court to reconsider Phatak's motion for summary judgment, setting out its determination as to whether there is a genuine dispute as to material facts. The district court should cite summary judgment evidence—the depositions, documents, affidavits or declarations, stipulations, admissions, or other materials in the record—upon which the dispute rests. If the record fails of facts upon which a reasonable jury could conclude that Phatak intentionally fabricated the report, the district court should grant Phatak's motion for summary judgment.

## III.

So, we VACATE the district court's order and REMAND for the district court to reconsider the motion for summary judgment, issue a determination confined to the summary judgment evidence with relevant citations to that evidence, and other further proceedings consistent with this opinion.

JAMES E. GRAVES, JR., Circuit Judge, dissenting:

I disagree with the majority's decision to vacate and remand for the district court to reconsider Phatak's motion for summary judgment. The record here overwhelmingly supports the district court's denial of summary judgment. Because I would conclude that the district court did not err, and I would dismiss for lack of jurisdiction, I respectfully dissent.

We review de novo a district court's denial of a motion for summary judgment on the basis of qualified immunity. *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010). The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if its resolution could affect the outcome of the action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The denial of a motion for summary judgment on the basis of qualified immunity is immediately appealable, to the extent that it turns on an issue of law. *Kovacic*, 628 F.3d at 211. The limitation of the interlocutory appellate jurisdiction to questions of law prohibits this court's consideration of the correctness of plaintiff's version of the facts. *Good v. Curtis*, 601 F.3d 393, 397 (5th Cir. 2010).

> This means that the district court's finding that a genuine factual dispute exists is a factual determination that this court is prohibited from reviewing in this interlocutory appeal. But the district court's determination that a particular dispute is material is a reviewable legal determination. Thus, a defendant challenging the denial of a motion for summary judgment on the basis of qualified immunity must be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the appeal.

*Id.* at 397-98. (Internal marks, citations and emphasis omitted).

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not

No. 16-20650

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

When the district court denies an official's motion for summary judgment predicated upon qualified immunity, this court is essentially reviewing the district court's decision that a "certain course of conduct would, as a matter of law, be objectively unreasonable in light of clearly established law." *Kinney v. Weaver*, 367 F.3d 337, 346 (2004). *See also Behrens v. Pelletier*, 516 U.S. 299, 312-13 (1996).

When a defendant moves for summary judgment on the basis of qualified immunity, the court must decide: 1) Whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right; and 2) whether that right was "clearly established" at the time of the defendant's alleged misconduct so that a reasonable official in the defendant's situation would have understood that his conduct violated that right. *See Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014). *See also Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009); *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir.2004) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *Brewer v. Wilkinson*, 3 F.3d 816, 820 (5th Cir. 1993).

On interlocutory appeal of the denial of summary judgment on the issue of qualified immunity, this court's jurisdiction is very limited. "Although a denial of a defendant's motion for summary judgment is ordinarily not immediately appealable, the Supreme Court has held that the denial of a motion for summary judgment based upon qualified immunity is a collateral order capable of immediate review." *Kinney*, 367 F.3d at 346. "Our jurisdiction is significantly limited, however, for it extends to such appeals only 'to the

8

extent that [the denial of summary judgment] turns on an issue of law.'" *Id.* (internal citation omitted).

Dr. Darshan Phatak, an assistant medical examiner with the Harris County Institute of Forensic Sciences (HCIFS), asserts that Noel Dean failed to submit evidence to avoid summary judgment and, therefore, the district court erred in not granting summary judgment. However, Phatak's argument is outside the scope of this court's limited jurisdiction on interlocutory appeal of the denial of a motion for summary judgment on the basis of qualified immunity. As the facts below establish, the district court did not err in concluding that, viewed in the light most favorable to Dean, the evidence presents a genuine question of material fact.

Noel Dean (Dean) and his wife Shannon Dean (Shannon) hosted a party of approximately ten friends and family members at their home in Houston on July 29, 2007. Sometime after midnight, a very intoxicated Shannon retired to the master bedroom/bathroom where Dean attended to her while she vomited. Dean left Shannon lying on the bedroom floor propped up on her elbow when there was a commotion outside and a guest's car window was broken. The party ended shortly thereafter. Dean drove an intoxicated guest home and returned about an hour later. All of the other guests had left except a friend, Doneshia Blount, who was asleep in the guest bedroom.

Upon his return, Dean said that Shannon was awake and sitting up on the floor of the master bedroom. He checked both his phone and Shannon's phone for any messages regarding the earlier commotion or the status of any departed guests. On Shannon's phone, he discovered text messages between Shannon and a male coworker that suggested she had been unfaithful, a recurring problem which they had been working through. The couple argued, and Dean punched the wall before walking into the bathroom to open the

window.  Dean saw movement and thought that Shannon was attempting to leave the bedroom.  Dean ran to the bedroom door to stop Shannon because she had a history of depression and had previously locked herself in the guest bathroom and attempted suicide by cutting her wrist with a razor.  Shannon had also attempted suicide by ingesting pain pills, had written about her thoughts of committing suicide with Dean's gun, and had received counseling from church elders regarding her suicidal thoughts, attempts and depression.  But, instead of going to the door, Shannon retrieved Dean's .40-caliber handgun from the dresser drawer and ran into the master bathroom, attempting to close the door behind her.  Dean reached the door and Shannon was lying on the bathroom floor with the gun to her head and asked him, "Is this what you want?"  Dean replied, "no," but Shannon pulled the trigger, shooting herself in the head.  Dean called 911 and attempted CPR, but Shannon died from a contact gunshot wound with no stippling to the right side of her head.  The gun remained in her right hand after the shooting.  Various authorities arrived on the scene and Houston Police Department officers quickly formed the belief that the scene was not consistent with suicide.  Dean was immediately detained in the backs of various patrol cars and voluntarily submitted to a gunshot residue test, which was inconclusive.

Later in the morning, Houston Police Department Detective Millard Waters arrived on the scene with his partner, Sergeant Jon Brooks.  Waters interviewed Blount at the scene and then Blount later gave a statement at the Homicide Division office.  Waters had Dean transported to the Homicide Division office to be interviewed without a *Miranda* warning.[1]  Dean maintained throughout the two different interrogations that morning and afternoon that Shannon shot herself and that he did not fire the weapon.  Dean

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

asserts that he used his hand as a gun during his explanations that Shannon had shot herself, but that Waters never asked him the exact position of the gun. However, in Waters' report, he said that he asked Dean three times how Shannon had pointed the gun at her head and that each time Dean demonstrated by putting "his index finger to his right temple with his fingers folded in, to signify the front sight had been at about eleven or twelve o'clock on Shannon's temple/head, with the stock/magazine well pointing down toward her feet."

On July 31, 2007, Phatak performed an autopsy on Shannon. Waters attended and participated in the autopsy. Prior to the autopsy, Waters also informed Phatak that he believed Dean murdered Shannon and that the direction of the gun was the key factor in determining whether it was murder or suicide. In other words, if the handle/grip was pointing down toward Shannon's feet, then it would be suicide; and if the handle/grip was pointed up toward the top of her head, then it would be murder. The draft autopsy report Phatak completed immediately after the autopsy indicated that both the cause and manner of death were "pending."

On August 6, 2007, Waters and Brooks met with Phatak and Chief Medical Examiner Luis Sanchez to discuss the forensic evidence. Waters said, and Phatak confirmed, that during this meeting, Phatak assured him "he would rule the case as either a suicide or a homicide. There would be no undetermined ruling." Subsequently, on August 27, 2007, Phatak submitted his first completed autopsy report where he concluded it was a "homicide." Phatak made this determination on the "overriding factor" that the position of the muzzle of the gun against Shannon's temple at the time of discharge would have had the handle pointing up toward the top of her head. Phatak made this determination without doing a comparison of the gun or a replica against the

11

actual wound or against a photograph of the wound. During his deposition, Phatak said that he made this determination based on the location of the "injector rod" on the gun toward her feet. Then he said that he was mistaken and that he made the determination based on the location of the "line of sight" toward her feet.

Following Phatak's determination of "homicide," on August 29, 2007, Dean was charged with murder and voluntarily turned himself in at the homicide division office. Once Dean was charged with murder, Waters was able to close his case that same day and show the case as being cleared.

Dean's first trial in 2009 ended in a mistrial after the jury was deadlocked. Dean was tried a second time in 2011. Phatak testified at both of these trials regarding his handle-up homicide determination that Shannon's wound was consistent with someone standing over her and shooting her from above. Based on issues with Phatak's testimony, Dr. Dwayne Wolf, the Deputy Chief Medical Examiner for HCIFS, was also asked to testify during the second trial. For his testimony, Wolf prepared on January 14, 2011, a photograph overlay, which Phatak had not done, to demonstrate the most significant factor of the position of the gun for the jury. Using overlay photographs, Wolf was able to compare the end of the gun with the wound and clearly demonstrate that the gun was held in the handle down position, as Dean had maintained since the time of the incident. On January 18, 2011, the manner of death was amended from homicide to undetermined. The state then dismissed the charges against Dean. Phatak subsequently appealed, asserting the following issues: 1) Whether the district court erred in denying summary judgment based on the statute of limitations; 2) Whether the district court erred in denying summary judgment as to Dean's claims under the Sixth and

Fourteenth Amendments; and 3) Whether the district court erred in denying summary judgment as to Dean's claim under the Fourth Amendment.

As an initial matter, the majority fails to address the first two issues, both of which are outside the scope of our jurisdiction. *See Kinney*, 367 F.3d at 346. Further, neither issue has merit. The district court did not err in determining that Dean's claims are not barred by the statute of limitations. *See Price v. City of San Antonio, Tex.,* 431 F.3d 890, 894 (5th Cir. 2005) ("[T]he statute of limitations does not begin running on section 1983 prosecution claims until proceedings have terminated in the plaintiff's favor.); *see also Castellano v. Fragozo,* 352 F.3d 939, 959 (5th Cir. 2003). The district court also did not err in concluding that there are cognizable claims under the Sixth and Fourteenth Amendments. *See Brady v. Maryland*, 373 U.S. 83, 86–87, 83 S. Ct. 1194 (1963); *Brown v Miller*, 519 F.3d 231, 237, 238 n.20 (5th Cir. 2008); and *Luna v. Beto*, 391 F.2d 329, 332 (5th Cir.1967). *See also Castellano*, 352 F.3d at 953–54 ("The initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if the accused is seized and arrested, for example, or other constitutionally secured rights if a case is further pursued."). The majority instead focuses on only the third issue and whether Phatak is entitled to summary judgment on the basis of qualified immunity.

The record clearly establishes that Phatak's autopsy report conclusion of "homicide" was crucial to Dean being arrested, indicted and taken to trial twice for murder. Dean was not arrested or charged until Phatak's "homicide" conclusion. Waters' probable cause affidavit relied on Phatak's findings. Further, the charge against Dean was dismissed in the middle of his second trial as soon as the autopsy report was amended from "homicide" to

"undetermined" upon the disclosure that Phatak's "homicide" conclusion was not supported by key evidence.

Phatak asserts that Dean failed to introduce evidence showing that Phatak's conduct was objectively unreasonable or that it violated clearly established law.  Accordingly, Phatak asserts that, even if there was evidence of a Fourth Amendment violation, the district court still erred in denying summary judgment on the basis of qualified immunity.  Essentially, Phatak's argument that his conduct was not objectively unreasonable rests on factual determinations.  Contrary to controlling authority set out herein, Phatak disputes that the facts should be viewed in the light most favorable to Dean.  Instead, Phatak would have the court view the facts in the light most favorable to him and rely on Waters' unproven theory and contradictory statements or evidence unsupported by the record.

The majority adopts Phatak's argument by erroneously failing to take the facts in the light most favorable to Dean and by reviewing the district court's finding that a genuine factual dispute exists in violation of clearly established law.  *See Good*, 601 F.3d at 397-98.  Further, the majority concludes that the district court's failure to "issue a determination confined to the summary judgment evidence with relevant citations to that evidence" requires remand.  But the district court repeatedly cited to the summary judgment evidence and complied with controlling authority from this court.  Specifically, the majority takes issue with the district court's citation to allegations in the pleadings in portions of its analysis.  However, in the pages of the district court's order preceding those references, the district court explains the facts it relied on and cites to relevant portions of the record.

The district court begins by explicitly stating the documents before it, as follows:

No. 16-20650

Before the Court are Defendants' Motion for Summary Judgment on the Limitations Issue (Doc. #153), Plaintiff's Response (Doc. #168), and Defendants' Reply (Doc. #182); Darshan R. Phatak's Motion for Summary Judgment (Doc. #155), Plaintiff's Response (Doc. #169), and Phatak's Objections & Reply (Doc. #175) and Amended Objections & Reply (Doc. #178); the City of Houston and Millard F. Waters' Motion for Summary Judgment (Doc. #157), Plaintiff's Response (Doc. #170), and Defendants' Reply (Doc. #173); and Harris County's Amended Motion[s] for Judgment on the Pleadings and Summary Judgment (Docs. ##163, 164, 165), Plaintiff's Response (Doc. #177), and Harris County's Reply (Doc. #179). In addition, the Court has reviewed a video recording of Waters' interrogation of Dean.

The district court later explains that: "The background facts in this Order are largely taken from this Court's prior Order granting in part and denying in part some of the defendants' motions to dismiss (Doc. #43), updated to reflect facts asserted in the Third Amended Complaint (Doc. #135) and the various motions, responses and replies." The district court then explained in detail the facts Dean may be able to prove at trial while also providing specific citations to various pleadings, which in turn include relevant exhibits and/or citations to other portions of the record. Additionally, Dean provides relevant citations in his brief.

In *Thompson v. Upshur County, Texas*, 245 F.3d 447 (5th Cir. 2001), this court said:

Ideally, the district court's order denying summary judgment based on qualified immunity explains what facts the plaintiff may be able to prove at trial, i.e. what particular facts the court assumed in denying summary judgment urged on the basis of qualified immunity. This facilitates appellate review by allowing this Court to focus on the aforementioned purely legal issues.

*Id.* at 456. This court further said that where a district court does not explain and simply denies a motion because "fact issues" remain, "[t]his Court has two

15

choices. We can either scour the record and determine what facts the plaintiff may be able to prove at trial and proceed to resolve the legal issues, or remand so that the trial court can clarify the order." *Id.*[2] (citing *Behrens*, 516 U.S. at 313 (where the district court does not identify the evidence "a court of appeals may have to undertake a cumbersome review of the record to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed.") (internal citations and marks omitted)). Missing from this authority is any requirement that the district court provide actual citations. Moreover, the district court did explain what facts it "likely assumed," and those facts are supported by the record.

Other than Phatak's "homicide" conclusion, there is no other evidence supporting homicide. Phatak says that Shannon's level of intoxication supports homicide. Phatak's theory was that "she threw up and passed out" on the bathroom floor and was unconscious at the time of the shooting. However, there is no evidence that Shannon was unconscious at the time she was shot and Phatak offered no evidence to prove such other than that she did not move away from the gun. That fact is clearly consistent with suicide in the absence of any evidence otherwise. All of the other witnesses from the party said that she had vomited earlier, Dean had assisted her, and then she was lying down in the bedroom. Nobody else saw Shannon on the bathroom floor.

Further, Phatak admitted that he did not have any toxicology training and that he had made untruthful statements in his trial testimony regarding Shannon's blood alcohol level.[3] Phatak's testimony established that he

---

[2] In *Thompson*, this court concluded that remand was not necessary. *Id.* at 456.

[3] The majority references both Shannon's 0.15 g/dL blood alcohol level and the alcohol level of 0.19 g/dL in her vitreous humor. However, the record in this matter establishes that the vitreous humor level is not an accurate representation. Additionally, Phatak conceded that a person is typically not in a "stupor," i.e., a state of mental confusion, until reaching a blood alcohol level of 0.30 to 0.40 – double or more than Shannon's level. Phatak also conceded that a typical person with a level of 0.15 or even 0.19 would be awake and able to run.

foreclosed an "undetermined" conclusion prior to having the forensic testing and toxicology results but after assuring Waters he would not conclude "undetermined." Phatak acknowledged that an "undetermined" conclusion should not have been foreclosed. Phatak reached a homicide conclusion based on his theory that Shannon "threw up and passed out." But, that conclusion, at least in part, was based on untruthful statements. A truthful statement is Phatak's acknowledgment that he and Waters had gotten together and that he was "confident we would come to one of the two." Further, when asked, Phatak acknowledged that he made a determination of homicide "with Detective Waters right there, egging on that he believed that this was a homicide."

Shannon was shot in the right temple as she lay on her back on the floor of the small master bathroom. Her right side was facing away from the door toward the sink. The bullet traveled up, exiting the left side of her head, through the wall into the bedroom and lodged in the box spring on the bed. For the right-handed Dean to have shot her, he would have had to get behind her and all the way down on the floor in the small space between Shannon and the counter so that he could aim the gun up or he would have had to straddle her and use his left hand twisted up. There is no evidence of either scenario. Instead, there is evidence to contradict both of those scenarios. There was no blood or gunshot residue on Dean's hands. Shannon had blood spatter on her right hand. The other people at the party corroborated Dean's statements. Phatak takes great issue with whether Dean ever had his gun out that night or whether he had left it in the laundry room to drive the guest home, but none of that establishes that the gun was never returned to the bedroom when Dean returned home. Further, there is no evidence that Dean ever acted in a threatening manner toward Shannon or anyone else. The infidelity issue had

17

been ongoing and it was not a new revelation that he was finding out for the first time. Shannon's letters corroborate that.

Dean counters that the district court properly denied summary judgment on the basis of qualified immunity because Phatak created a false, misleading, and inaccurate autopsy report and violated Dean's clearly-established constitutional right to be free of fabricated evidence in a criminal proceeding. Specifically, Dean asserts that: Phatak violated his Fourth Amendment right to be free from unreasonable searches and seizures by falsifying the autopsy report; Phatak conferred with and was improperly influenced by Waters' immediate determination that Dean murdered Shannon; Phatak told Waters he would not classify the manner of death as "undetermined" before he even received all of the evidence and lab results; and Phatak suppressed exculpatory evidence by failing to compare the gun to the wound to determine the position of the gun despite that being the determinative factor and by disregarding evidence of suicide.

Phatak admitted during his deposition that evidence of prior suicide attempts and suicidal ideation in a person with a contact head wound would suggest a conclusion of suicide. Wolf also testified that this evidence would weigh in favor of suicide. Phatak admitted that he knew about Shannon's history and her writings about committing suicide with the gun prior to concluding homicide. The evidence of suicide included prior attempts, the scar on her wrist from one of those prior attempts, the various letters she had written regarding her feelings of unworthiness, depression, and self-harm, and her admissions to church elders. At trial, Phatak testified that but for the alleged demonstration of how Shannon shot herself shown in the snippet of video of Dean's interrogation he viewed at Water's request, he would not have ruled this a homicide. However, Phatak later testified in his deposition that

nothing about Dean's description of how Shannon shot herself indicated homicide rather than suicide. Regarding the side-by-side comparison of the gun to the wound, Wolf testified that such a comparison was not routinely performed because "usually, it's pretty clear cut which way the gun is." But Wolf also testified that this was one of the cases where such a comparison was necessary to make an accurate interpretation.

Citing *Brown v Miller*, 519 F.3d 231, 237 (5th Cir. 2008), the district court concluded that Dean had presented enough evidence that "a reasonable juror could conclude that Phatak performed his autopsy report in a manner that was tantamount to falsification of evidence." The district court further acknowledged the facts presented by Dean that Phatak violated his Fourth, Sixth, and Fourteenth Amendment rights and concluded that the evidence, viewed in the light most favorable to Dean, presented a genuine question of material fact. The court then determined that, as of 2007 and based on authority set out herein, a reasonable medical examiner would have understood that intentional fabrication of evidence violated a defendant's rights.

Phatak unsuccessfully attempts to distinguish *Brown* on the basis that it involved a motion to dismiss and the Fourteenth Amendment. That *Brown* involved a motion to dismiss is of no consequence here because it is cited for clearly establishing the right. Moreover, Phatak acknowledges in his reply brief that the right is clearly established if the evidence supports the allegation. Also, Dean indeed has a Fourteenth Amendment claim.

Accordingly, for the reasons stated herein, I conclude that the record and the applicable authority support the district court's denial of summary judgment. Further, I conclude that it is unnecessary to remand for the district court to reconsider Phatak's motion for summary judgment. The district court

has already thoroughly considered the motion and sufficiently explained its findings, all of which are supported by the record.  Thus, I respectfully dissent.